FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Mar 29, 2021

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| P.B., a Minor Child By and Through His Parents, T.B. and L.B.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>THORP SCHOOL DISTRICT,<br><br>　　　　Defendant. | No. 1:20-CV-03032-SAB<br><br>**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

　　　Before the Court are Plaintiffs' Motion for Summary Judgment, ECF No. 36, and Defendant's Opposition and Cross-Motion for Summary Judgment, ECF No. 37. The motions were considered without oral argument. This case is before the Court on an appeal from an administrative law judge's ruling on claims under the Individuals with Disabilities Education Act ("IDEA"). Plaintiffs request the Court reverse several determinations made by the ALJ, whereas Defendant requests that the Court uphold the ALJ's order. Having reviewed the briefing, the administrative record, and the relevant caselaw, the Court denies Plaintiffs' motion and grants Defendant's motion.

**Facts**

　　　Although the motions before the Court are noted as summary judgment motions, the posture of IDEA appeals is more akin to a bench trial on a stipulated factual record. *See Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891-

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 1**

92 (9th Cir. 1995). The existence of a dispute of fact will not preclude summary judgment. Thus, the facts summarized below are pulled from the parties' statements of fact, the ALJ's Order (located at ECF No. 18), and the administrative record.

1. <u>P.B.'s Time as a Student in the District in the 2018-2019 School Year</u>

P.B. attended preschool in the Ellensburg School District for the 2017-2018 school year. In April 2017, while a student in Ellensburg, the Ellensburg School District determined that P.B. was eligible for special education services. The Ellensburg School District put in place an individualized educational plan ("IEP") also in April 2017. The IEP called for 30 minutes of speech and language services per week delivered by a speech language pathologist in a special education setting. In March 2018, a second IEP was implemented for P.B., and also called for 30 minutes of speech and language services. On April 24, 2018, P.B. was diagnosed with Autism Spectrum Disorder ("ASD") for the first time. On April 26, 2018, P.B.'s medical provider, Dr. Walters, recommended P.B. receive occupational therapy for his sensory processing issues and be evaluated for those services.

Before the end of the school year, P.B. and his family moved from the Ellensburg School District to Defendant, the Thorp School District ("the District"). On May 11, 2018, P.B.'s mother completed paperwork to enroll P.B. in the District—P.B. was to begin school on September 10, 2018. The District received the paperwork on May 30, 2018. The paperwork noted P.B.'s diagnosis of ASD as well as some of the other behaviors he exhibited in his preschool classroom, including difficulties making friends and rigidity. It also indicated Ellensburg School District had provided the District with special education forms. In addition, P.B.'s mother provided the District with copies of P.B.'s evaluation for ASD and a letter from his preschool teacher to P.B.'s medical provider. The Ellensburg School District recommended the District conduct further evaluation of P.B., specifically in the area of occupational therapy.

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT \* 2**

On May 17, 2018, prior to the end of the school year, P.B.'s preschool teacher, Ms. Sanders, completed a kindergarten transition summary form, which included information about P.B.'s abilities and difficulties in her preschool classroom. It also noted certain successful techniques she used with P.B., though it appears from the record the District did not actually receive the transition summary form from Ms. Sanders or P.B.'s mother.

P.B. was set to start kindergarten in the District on September 10, 2018. At that time, his March 2018 IEP was still in place, so the District made plans to evaluate P.B. for occupational therapy services as recommended by P.B.'s medical providers and the Ellensburg School District. On September 7, 2018, P.B., his mother, and his grandmother met with P.B.'s kindergarten teacher, Andrea Green, to prepare for the school year. During the meeting, the District's special education teacher, Becky Hill, gave P.B.'s mother a form to sign, which gave the District permission to conduct the recommended occupational therapy evaluation. P.B.'s mother said that she wanted a "full" evaluation, but did not indicate what exactly she meant by this request. P.B.'s mother testified that she asked Ms. Green for help in filling out the form, but eventually signed the blank form and returned it. Mel Blair, the District's special education director and assistant principal, later filled out the signed form with P.B.'s name, grade, and the evaluation he was recommended to receive. The District planned to begin the evaluation after the first few days of school to allow P.B. time to adjust to the classroom environment. The first portion of P.B.'s occupational therapy evaluation was completed on September 20, 2018.

From early on in P.B.'s time in Ms. Green's kindergarten class, P.B. exhibited multiple behavioral difficulties beyond the issues seen in his preschool classroom. Ms. Green testified that P.B. was noncompliant 50% of the time, and this sometimes led to him running away. She also testified that P.B. did not want to follow directions 99% of the time and often cried when he did not get his way. He

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 3**

would flop to the ground when he got frustrated. However, she testified that she did not feel like P.B. was struggling in her class and only needed more time to adjust to the classroom setting. Ms. Green has taught kindergarten for six years, is certified to teach special education from kindergarten through eighth grade, and has worked as a special education teacher in the past. She is also trained in Right Response, a program to deescalate conflicts with disabled and autistic students, including through the use of restraints as a last resort. She receives one day of training per year to keep her certification current.

A series of incidents between P.B. and Ms. Green ultimately led to his parents withdrawing him from the District. On September 19, 2018, P.B. had a meltdown in the lunchroom. P.B.'s sister was called to help calm him down, after which he and his sister walked to the student services coordinator's office. The coordinator, Laura Jones, called P.B.'s mother to come to the school. Once P.B. had calmed down and was playing with Legos in Ms. Jones' office, Ms. Green was called to bring P.B. back to class. P.B. said that he thought Ms. Green was mean and did not want to go back to class. Ms. Green arrived and asked P.B. to clean up the Legos and return to class. Ms. Green told P.B.'s mother not to help him clean up. Ms. Green then took P.B.'s hand and told him it was time to go back to class. She held onto P.B.'s hand and they tried to walk back to class. Ms. Green testified that she held P.B.'s hand because she was worried he would try to run away. P.B. lagged behind Ms. Green a bit, and P.B.'s mother testified that she thought Ms. Green was "dragging" him down the hall.

On September 27, 2018, Plaintiffs allege Ms. Green held onto P.B.'s arm or wrist when she became worried that he would dart into oncoming school bus traffic in the school parking lot. On that day, P.B.'s mother was late to pick him up from school, so he waited with Ms. Green and other students for his mother to arrive. When the group got to a grassy area to wait, P.B. wiggled free from Ms. Green's hand and ran towards the school busses. Ms. Jones got in front of P.B. and stopped

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 4**

him from running into the parking lot. Ms. Green grabbed P.B.'s hand again and told him he would have to hold her hand until his mother arrived. This made P.B. very upset. He cried, swung his backpack, and fell to the ground. This went on for about ten to fifteen minutes. At some point, P.B.'s sister went to call their mother, but testified that she saw Ms. Green digging her nails into P.B.'s skin. When P.B.'s mother arrived, she told Ms. Green that she was unhappy with how Ms. Green handled the situation but did not want to have an altercation with her, so she took P.B. home.

On September 27, 2018, P.B.'s mother spoke on the phone with Ms. Green about concerns regarding P.B.'s meltdowns and inability to follow directions in class. P.B.'s mother reiterated that these behaviors were caused by his autism. Ms. Green said that, although autism manifests differently in every student, she did not believe these behaviors were typical of autism and were more reflective of general noncompliance. She said P.B.'s mother should not use his autism diagnosis as an excuse for his behavior.

Soon after this conversation, P.B.'s mother emailed Andrew Perkins, the District's superintendent and principal, to express concerns that Ms. Green did not understand P.B.'s diagnosis and to ask how to best address these concerns. P.B.'s mother indicated that she did not believe Ms. Green was interested in learning how to help P.B. and that she did not feel communicating directly with Ms. Green would be productive. Mr. Perkins suggested that he set up and attend a meeting with Ms. Green and P.B.'s mother.

On September 28, 2018, P.B.'s mother emailed Mr. Perkins to report her concerns about what had happened the day prior near the school busses. She reported that she saw bruises on P.B.'s arm that she said were caused by Ms. Green. She reported that she tried to address these concerns with Ms. Green and Ms. Jones the day before, but felt that Ms. Green got defensive in response. She reiterated that P.B.'s autism was the cause of his behaviors, and that Ms. Green's

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 5**

strategies were not working and would only result in more outbursts and meltdowns. She asked that Mr. Perkins step in and help with the situation.

Upon this notification, Mr. Perkins investigated P.B.'s mother's claims. He watched school surveillance footage of the event and spoke to staff members that were present. Mr. Perkins is a mandatory reporter for child abuse under state law. Based on his experience and review of the evidence, he concluded that Ms. Green handled the school bus situation appropriately. At some point in these email exchanges, a meeting was scheduled for October 4 with P.B.'s mother, Ms. Green, Mr. Perkins, Ms. Jones, and the District's special education director.

On October 3, P.B.'s mother picked up P.B. from school and witnessed another interaction between P.B. and Ms. Green. Ms. Green was trying to have a conversation with P.B. about his difficulty returning to class after recess. P.B. would not look at Ms. Green. P.B.'s mother saw Ms. Green put her hands on P.B.'s upper arms and turn him to face her so she could talk to him with eye contact. P.B.'s mother testified that she thought this was aggressive. Ms. Green testified that she wanted to work on eye contact with P.B., as autistic children often have problems with making eye contact.

P.B.'s mother sent another email to Mr. Perkins and Ms. Jones about the eye contact incident. She also indicated that, as they were walking to the car that day, P.B. said that he thought Ms. Green was mean and had hurt his arms. P.B.'s mother said that she would file a police report and a citizen's report with the Washington State Office of Superintendent of Public Instruction ("OSPI") if another incident occurred. She reiterated that she did not think Ms. Green understood P.B. or his diagnosis, and that she did not feel P.B. was safe at school. Mr. Perkins suggested that they discuss these concerns at the meeting set for October 4. However, at P.B.'s mother's request, that meeting was rescheduled to October 9. P.B.'s mother asked what plan was in place to ensure P.B.'s safety until the meeting. Mr. Perkins replied that P.B. was safe at school and that the District had policies in place to

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 6**

keep all students safe at school. He also said that Ms. Green wanted to meet with P.B.'s mother in a one-on-one meeting. P.B.'s mother replied that she did not feel comfortable meeting with Ms. Green, and that she would be keeping P.B. home from school until the October 9 meeting. The meeting was rescheduled again to October 11, ostensibly so P.B.'s mother could invite P.B.'s preschool teacher to the meeting.

Ultimately, no meeting was ever held, and P.B. only attended fifteen days of school over four weeks in the District. On October 4, 2018, P.B. was absent from school, but the occupational therapist was on campus to complete his evaluation. School officials called P.B.'s parents to ask if they could bring P.B. to school for his evaluation. It was then that P.B.'s parents notified the District that they had decided to withdraw P.B. from the District. P.B.'s mother followed up by sending an email to Mr. Perkins and Ms. Jones, asking that the District release P.B. so that he could be enrolled in an online homeschooling program through the Omak School District. The release was finalized on November 19, 2018. However, P.B. never actually did any of the homeschooling programing because his mother thought his symptoms were too severe for homeschooling.

On October 25, 2018, Ms. Jones emailed P.B.'s mother, asking if she wanted P.B. to come to school for his speech therapy and if she wanted to move forward with the occupational therapy evaluation. P.B.'s mother never responded because she still felt the District had not addressed her concerns about P.B.'s safety. The occupational therapy evaluation was never completed, and P.B. only ever received 15 minutes of speech language services under his IEP while enrolled in the District.

Late in October 2018, Plaintiffs retained counsel to see if they could resolve their issues with the District. In addition, P.B. saw several private psychotherapists, speech language therapists, and counselors. These providers confirmed P.B.'s ASD diagnosis, and also saw symptoms of disorders including ADHD, anxiety, PTSD,

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 7**

and intermittent explosive disorder. He began to engage in fight or flight behaviors, and to elope more frequently. He gained a significant amount of weight, which at least one provider attributed to overeating as an attempt to self-soothe. All of the providers believed that some external trauma caused P.B.'s condition to worsen, and at least one—Dr. Tutty, who diagnosed P.B. with intermittent explosive disorder—specifically attributed it to P.B.'s time in Ms. Green's classroom.

In March 2019, P.B. visited Gersh Academy Cougar Mountain, a private school specializing in the education of autistic children in Issaquah, Washington. All students at Gersh have IEPs and all staff members are trained in Crisis Prevention Intervention methods of de-escalating students before using restraints as a final resort. Based on observations during the visit, Gersh staff determined that P.B. would be a good fit for the school's kindergarten through second grade program. Gersh also believed that it could implement all of the recommendations from P.B.'s medical providers, primarily Dr. Tutty. These recommendations would have been much more restrictive than P.B.'s March 2018 IEP and would have him removed from a general education setting entirely.

2. The Due Process Hearing

On May 30, 2019, Plaintiffs filed for a due process hearing with the State. The hearing took place on September 16 through 20, 2019 before an ALJ with the Office of Administrative Hearings for the Superintendent of Public Instruction. The issues raised at the due process hearing included:

- Whether the District violated the IDEA and denied P.B. a free appropriate public education during the 2018-2019 by:
    - Failing to implement P.B.'s March 2018 IEP;
    - Failing to evaluate P.B. after his referral for an evaluation by the Ellensburg School District, after the District became aware of P.B.'s

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 8**

ASD diagnosis, and after P.B. experienced challenges in the classroom because of his disability;

- o Denying the Parents full participation in P.B.'s 2018 reevaluation when the District changed the course of the evaluation without informing the Parents;

- o Denying the Parents full participation in developing or revising P.B.'s IEP when the District did not provide the Parents with the data and information needed to fully participate; and

- o Failing to provide P.B. with an appropriate educational program for the 2018-2019 academic year, including providing no specially designed instruction or related services.

- And, whether the Parents are entitled to their requested remedies, including:

  - o A finding that P.B. was denied a free appropriate public education (FAPE) under the IDEA starting September 10, 2018 through the date of the ALJ's order;

  - o A finding that the appropriate program for P.B. for the 2019-2020 school year was placement at Gersh Academy, as well as living expenses for P.B. and his mother during the school week in Issaquah;

  - o A finding that the District is to provide P.B. with appropriate speech and language services for the number of sessions missed during the 2018-2019 school year with P.B.'s private therapist; and

  - o Compensatory education to P.B. during the 2019-2020 school year due to his loss of educational opportunity for the 2018-2019 school year, in the form of Applied Behavioral Analysis therapy services after the school day at District expense.

AR 1095-96. At the hearing, both parties submitted exhibits and presented witness testimony.

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 9**

The ALJ ruled in favor of the District on most of the issues asserted in the hearing, but did find in favor of Plaintiffs in several important ways. The ALJ found that the District failed to provide P.B. with a free appropriate public education because it failed to provide him with two hours of speech and language services in accordance with his IEP while he was a student in the District. The ALJ also found that the District violated the IDEA when it failed to provide P.B.'s parents with prior written notice before initiating the occupational therapy reevaluation in September 2018. The ALJ ordered the District provide the speech and language services P.B. was due while a student in the District and to conduct the evaluation for occupational therapy services, as well as any other services that may now be warranted based on P.B.'s updated medical history.

The ALJ found in favor of the District on all other remaining issues and denied the remainder of Plaintiffs' requested remedies, including a finding that Ms. Green bullied P.B., prospective placement at the Gersh Academy at the District's expense, and reimbursement for medical and therapeutic services. This appeal followed the ALJ's order. The Court previously denied a motion by Plaintiffs to admit additional evidence to supplement the administrative record.

### Legal Standard

The Individuals with Disabilities Act (IDEA) provides that disabled children shall have access to a free appropriate public education (FAPE) that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living. 20 U.S.C. § 1400(d)(1)(A). The IDEA also provides certain procedural and substantive rights for disabled children and their parents. 20 U.S.C. § 1400(d)(1)(B).

When a parent believes that their child has been deprived of a FAPE in violation of the IDEA, they are first entitled to an impartial due process hearing before an administrative law judge. 20 U.S.C. § 1415(f). A party may file a civil action to appeal the decision of the ALJ if they do not have the right to appeal

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 10**

under the Act. 20 U.S.C. § 1415(i)(2). In any such action, the reviewing court shall (1) receive the administrative record; (2) hear additional evidence at the request of a party; and (3) grant relief as the court determines is appropriate based on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C). The party challenging the ALJ's determination has the burden of persuasion that the ALJ's order should be reversed or not deferred to. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

Judicial review of an ALJ's order in an IDEA case differs substantially from judicial review of other agency actions, wherein the courts are generally confined to the administrative record and are held to a highly deferential standard of review. *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993). In contrast, in reviewing the ALJ's decision in an IDEA case, the district court must give "due weight" to the state's judgments of education policy, but is not necessarily required to give high deference to her opinion. *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). The Court must consider the agency's findings carefully and endeavor to respond to the hearing officer's resolution of each material issue. *Cty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996). An ALJ's findings are entitled to "substantial weight" if the "decision evinces [the ALJ's] careful, impartial consideration of all the evidence and demonstrates [the ALJ's] sensitivity to the complexity of the issues presented." *Jackson*, 4 F.3d at 1476. An ALJ's findings are thorough and careful when "the officer participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" *R.B. ex rel. F.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 942 (9th Cir. 2007) (quoting *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006)). However, the duration of a hearing, an ALJ's active involvement in a hearing, or the length of the ALJ's opinion cannot serve as proxies for independent assurance that the ALJ's order was in fact thorough, careful, and supported by the

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 11**

record. *M.C. ex. rel. M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194-95 (9th Cir. 2017). "After such consideration, the court is free to accept or reject the [administrative] findings in part or in whole." *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987).

A Court's inquiry in suits brought under the IDEA is twofold: (1) has the state complied with the procedures set forth in the Act? and (2) is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? *Rowley*, 458 U.S. at 206-07; *R.B.*, 496 F.3d at 938.

The procedural safeguards of the IDEA are designed to protect the rights of disabled children and their parents. 20 U.S.C. § 1415. Compliance with the IDEA's procedural safeguards—particularly those designed to ensure parents' meaningful participation—is essential to ensuring that every eligible child receives a FAPE. *Amanda J. v. Clark Cty. Sch. Dist.*, 267 F.3d 877, 891 (9th Cir. 2001). Procedural violations warrant a remedy only if the violations impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process regarding the provision of the FAPE to the child, or otherwise caused a deprivation of educational benefits. 20 U.S.C. § 1415(f)(3)(E)(ii); 34 C.F.R. § 300.513.

To meet its substantive obligations under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of their circumstances. *Endrew F. ex. rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). In determining the appropriateness of an IEP, the reviewing court should consider whether the IEP was appropriately designed and implemented so as to convey a meaningful benefit to the student. *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999). An IEP is a "'snapshot, not a retrospective,'" and courts should be careful to consider that the IEP takes into account "'what was, and was not, objectively reasonable when the snapshot was

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 12**

taken . . . at the time the IEP was drafted.'" *Id.* (quoting *Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1041 (3rd Cir. 1993)). "An 'appropriate' public education does not mean the absolutely best or 'potential maximizing' education for the individual child. . . . The states are obliged to provide a 'basic floor of opportunity through a program 'individually designed to provide educational benefit to the handicapped child.'" *Gregory K.*, 811 F.2d at 1314 (quoting *Rowley*, 458 U.S. at 197 n.21); *see also Endrew F.*, 137 S. Ct. at 999 ("Any review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal.") (emphasis in original). Only material failures to implement an IEP violate the IDEA; a material failure occurs when there is more than a minor discrepancy between the services a school provides to a disabled child and the services required by the child's IEP. *Van Duyn v. Baker School Dist. 5J*, 502 F.3d 811, 822 (9th Cir. 2007).

### Discussion

Plaintiffs argue that the ALJ erred and that the Court should overturn certain portions of the ALJ's order. The District argues that the ALJ did not err and the Court should uphold the ALJ's order. For the reasons discussed below, the Court denies Plaintiffs' motion and grants the District's motion.

1. How Much Weight to Accord the ALJ's Order

As a preliminary matter, the Court must determine how much weight to accord the ALJ's order. Although Plaintiffs do not clearly articulate their position, it appears Plaintiffs want the Court to give the ALJ's order limited weight, in part because they believe the ALJ applied the incorrect legal standards and in part because they believe the ALJ improperly weighed the evidence. The District argues the ALJ considered the evidence presented at the hearing, was actively involved in questioning witnesses and in developing the record, and issued a detailed and thorough Order.

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 13**

As the party challenging the ALJ's order, Plaintiffs have the burden of persuasion as to whether the ALJ's order should be deferred to. As discussed below, the Court is not persuaded by Plaintiffs' argument that the Court should not defer to the ALJ. The ALJ's order was detailed, thorough, and supported by the record. It includes detailed explanations of how and why certain evidence or testimony was given more or less weight. Plaintiffs do not show that the ALJ's decision to weigh certain testimony in certain ways was an error of law or fact. Thus, although the Court examined the underlying record itself and drew its own conclusions, it also finds that the ALJ's order is entitled to deference.

2. Whether P.B. was Denied a FAPE when the District Failed to Provide Behavioral Services or Supports

Plaintiffs argue that the ALJ erred when it found that P.B. was not denied a FAPE by virtue of the District's failure to provide him with behavioral services or supports in light of his "significant" behavioral issues at school. They argue that the District should have provided the same behavioral supports used by P.B.'s preschool teacher. The District argues the ALJ properly rejected this argument because those behavioral supports were not part of P.B.'s IEP and therefore were not required to be provided while he was a student in the District. It argues that it cannot be faulted for not implementing a plan it did not have. Finally, it argues that, even if it were aware of the supports used by P.B.'s preschool teacher and/or P.B. was eligible to receive those services under his IEP, it was not required to use the same methods and strategies.

The parties agree that P.B.'s March 2018 IEP was in effect when he started school at the District, and the District never developed or implemented a new IEP during his short time in the District. The March 2018 IEP only called for 30 minutes of speech and language education per week, and provided that P.B. be in a general education classroom for the rest of the school week. Because the controlling IEP did not include behavioral support services, the District was not

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 14**

required to provide those services. Even if the District was required to provide behavioral support services, the ALJ found and the record supports a finding that the District was not on notice of the supports used by P.B.'s preschool teacher, and therefore failure to implement those same supports is not a violation of the IDEA. *See Van Duyn*, 502 F.3d at 823-24 (finding no violation of the IDEA where middle school did not implement the exact same behavioral management plan as student's elementary school).

Although P.B. may have qualified for behavioral supports at the time he was withdrawn from the District, those supports were not called for under the March 2018 IEP. Under Washington law, a school district that receives a student as a transfer from another district must provide a student a FAPE by either adopting the student's IEP from the prior school district or by developing a new IEP. *See* Wash. Admin. Code § 392-172A-03105. The District did not violate the IDEA by not providing services that were not included in the controlling IEP. This issue is separate—although related—to whether the District should have done a behavioral evaluation of P.B.; whether the District should have done one evaluation over another is distinct from whether certain services were in fact required by the IEP. Plaintiffs appear to be conflating these two issues. Nonetheless, the ALJ did not err in finding that the District was not required to provide behavioral supports and services that were not included in the March 2018 IEP. Plaintiffs' motion is denied, and Defendant's motion is granted.

3. Whether P.B. was Denied a FAPE when the District Proposed Only an Evaluation in Occupational Therapy Instead of a "Full" Evaluation

Plaintiffs next argue that the ALJ erred when she held that the District had not deprived P.B. of a FAPE when it proposed evaluating him only in the area of occupational therapy as opposed to a "full" evaluation. They argue that, based on P.B.'s brief time in Ms. Green's classroom, it was apparent that his behavioral struggles would need more than just occupational therapy supports. They argue

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 15**

that the District should have evaluated P.B. for more services under the IDEA's
Child Find requirements. In support of their position, they point to the ALJ's order
that the District evaluate P.B. for occupational therapy services, as well as any
other areas where an evaluation that might be warranted based on P.B.'s current
medical records and needs. The District argues that the ALJ correctly held that the
District appropriately initiated an evaluation in the area of occupational therapy
only based on the recommendations of P.B.'s physicians. It also argues the ALJ
was correct in holding that the Parents failed to establish any specific areas in
which P.B. should have been evaluated at the time the evaluation was initiated, and
that Parents' decision to withdraw P.B. before the proposed evaluation was
complete prevented the District from addressing any other areas of concern that
might have remained. AR 1115-16. Thus, it argues the ALJ's decision should be
upheld.

The Child Find requirements of the IDEA provide that a state must have
policies in place to identify, locate, and evaluate all children with suspected or
known disabilities. 20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111; Wash. Admin.
Code § 392-172A-02040. Under Washington law, a district must evaluate a student
in all areas of suspected disability. Wash. Admin. Code § 392-172A-03020(3)(e);
*see also Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1110 (9th
Cir. 2016) (citing analogous portions of IDEA). An evaluation must include review
of existing evaluation data on the child and—with input from the child's parents
and, if appropriate, the child—identify what additional data is needed to determine
whether the child has a disability and his educational needs. 34 C.F.R.
§ 300.305(a). The district must also not rely on any one assessment to determine a
child's disability, and the evaluation must be sufficiently comprehensive to identify
all of the child's education and service needs, whether or not commonly linked to
the child's disability diagnosis. 34 C.F.R. § 300.304(b)(2), (c)(6). Thus, "if a
school district is on notice that a child may have a particular disorder, it must

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 16**

assess that child for that disorder, regardless of the subjective views of its staff members concerning the likely outcome of such an assessment." *Timothy O.*, 822 F.3d at 1121. That notice can be in the form of expressed parental concerns about a child's symptom, expressed opinions by informed professionals, or indicators such as a child's behavior in or out of the classroom. *Id.* "Such notice automatically triggers" the mandatory child find procedures required by the IDEA. *Id.* at 1121-22.

There is no binding Ninth Circuit caselaw on how courts are to determine whether a violation of child find laws has occurred and whether that amounts to a deprivation of a FAPE. *See G.M. ex rel. G.M. v. Saddleback Valley Unified Sch. Dist.*, 583 Fed. App'x 702, 703-04 (9th Cir. 2014) (noting, on an appeal to an award of attorney's fees to the district, that the question of whether a school district violated its child find duties was one of first impression and was a "close" question given that the student's school counselor was advised of the student's diagnosis of major depressive disorder). Some district courts have relied on a test articulated by the District Court of Hawai'i: "the child-find duty is triggered when the [state or LEA] has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability." *Dep't of Educ., State of Hawai'i v. Cari Rae S.*, 158 F. Supp. 2d 1190, 1194 (D. Haw. 2001); *Dep't. of Educ. of Hawaii v. Leo W. ex rel. Veronica W.*, 226 F. Supp. 3d 1081, 1097-98 (D. Haw. 2016) ("However, the Ninth Circuit has neither adopted this test nor articulated its own."). The Ninth Circuit has found that the Hawai'I Department of Education met its child find obligations when it assessed a student in all areas of her suspected disabilities—including an auditory processing disorder and ADHD—when the department reviewed the student's records, reports, testing data/grades, and input from teachers, parents, and the student herself that indicated she was performing in her general education classes. *C.M. ex rel. Jodi M. v. Dep't. of Educ., State of Hawai'i*, 476 Fed. App'x 674, 677 (9th Cir. 2012). However, the

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 17**

1  Circuit still did not detail what factors a court should consider in determining

2  whether there was a violation of the district's child find obligations.

3        Plaintiffs rely heavily on *Timothy O.* In *Timothy O.*, the Ninth Circuit held

4  the district had deprived the student of a FAPE when it had reason to believe that

5  the student was autistic but chose not to conduct an assessment because, after an

6  informal observation, the school district did not believe he really had autism.

7  *Timothy O.*, 822 F.3d at 1109. In that case, the student had no diagnosis at the time

8  he was observed by the school district, but did have a provisional diagnosis noting

9  that the student was exhibiting behaviors that could be attributed to autism.

10  Plaintiffs also rely on *S.P. ex rel. Palacios v. East Whittier City School District*,

11  735 Fed. App'x 320 (9th Cir. 2018). In that case, the Ninth Circuit held that the

12  district had denied the student a FAPE when it tied her eligibility for special

13  education services to only her speech and language disorder and not also to her

14  hearing impairment. *S.P.*, 735 Fed. App'x at 322. The Circuit also held that the

15  district violated the IDEA because the district only assessed the student's speech

16  and language disability and not her hearing impairment. *Id.* at 322-23.

17        Plaintiffs argue that, because the District was on notice (and actually knew)

18  of P.B.'s autism diagnosis, it was required to conduct a "full" evaluation of P.B.,

19  not just an occupational therapy evaluation, in order to determine what services

20  may have been of use to him. Plaintiffs also argue that Ms. Green denied that P.B.

21  had autism and thought that P.B.'s parents were using his autism as an excuse for

22  his abilities and non-compliant behavior. Plaintiffs argue that a full evaluation

23  pursuant to the child find laws should have been given so that it could be

24  determined whether all of P.B.'s problems were in fact manifestations of his

25  autism. They argue that anything less than a full evaluation would not have

26  provided a complete picture of P.B.'s needs. They point to the fact that the ALJ

27  noted that the parties had "very different" understandings of what the scope of

28  P.B.'s reevaluation would entail, and noted that the failure to issue to the Parents a

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 18**

prior written notice of the evaluation prevented the parents from providing input as to what evaluations that they thought were warranted. AR 1117-18. In response, the District argues that the ALJ was correct in holding that it was not required to perform any evaluation other than the occupational therapy evaluation it planned on doing. The District argues that, because the Ellensburg School District and P.B.'s physicians only recommended an evaluation in the area of occupational therapy, it was not inappropriate or unreasonable for it to do only that evaluation at that time. It argues Plaintiffs can cite to no law in their favor.

Here, the ALJ concluded that the District's evaluation was appropriate because P.B.'s prior district and medical providers said that an occupational therapy evaluation should be completed. The ALJ concluded that, even if P.B. was exhibiting behavioral problems in the classroom, those problems were not apparent when the evaluation began and only manifested after the evaluation had already begun. AR 1116. Plaintiffs do not point to any area of the record that indicates that the District was on notice that P.B.'s autism was causing him to have the sorts of behavioral problems he began having in Ms. Green's classroom until after the recommended occupational therapy evaluation began. Furthermore, the Ninth Circuit has recognized that a parent does not have the right to dictate specific areas in which a school district must assess a student as part of a special education evaluation. *Avila v. Spokane Sch. Dist. 81*, 686 Fed. App'x 384, 385 (9th Cir. 2017); *L.C. ex rel. A.S. v. Issaquah Sch. Dist.*, No. C17-1365-JLR, 2019 WL 2023567, at *17 (W.D. Wash. May 8, 2019).

Because the IDEA requires only that a district's evaluation be reasonably calculated to enable the child to receive educational benefits, and P.B.'s own medical providers believed that only an occupational therapy reevaluation was warranted at the time the evaluations began, Plaintiffs' motion is denied and Defendant's motion is granted.

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 19**

4.  <u>Whether P.B. was Denied a FAPE through Ms. Green's Aggressive
    Behavior or "Bullying"</u>

Plaintiffs next argue the ALJ erred when she found that P.B. was not denied
a FAPE as a result of Ms. Green's "aggressive" behavior or "bullying" of P.B. The
ALJ found that Ms. Green had not bullied P.B., so there was no denial of a FAPE.
The District argues the Court should uphold the ALJ's order because the ALJ
entered detailed factual findings about each of the alleged incidents of "bullying,"
made detailed credibility determinations based on evidence in the record and
testimony at the hearing, and concluded that the evidence did not support a
conclusion that P.B. was a victim of bullying.

"If a teacher is deliberately indifferent to teasing of a disabled child and the
abuse is so severe that the child can derive no benefit from the services that he or
she is offered by the school district, the child has been denied a FAPE." *M.L. v.
Federal Way Sch. Dist.*, 394 F.3d 634, 650 (9th Cir. 2005). In that case, the Ninth
Circuit concluded that an autistic student—who was removed from school after
only five days in the classroom—was not denied a FAPE based on the district's
alleged failure to prevent the student from being teased by his classmates, given
that the school did not have a chance to remedy the teasing. However, the Circuit
also reasoned that the student, by virtue of his autism, was not aware that he was
being teased, so he had not been deprived of the benefits of the district's services.

Although Plaintiffs argue in their motion that the ALJ applied the wrong
test, the ALJ applied the proper legal test under *M.L*, albeit slightly modified to
account for the fact that the teacher was the alleged bully and the district was the
deliberately indifferent party. Rather, where the parties disagree is whether the ALJ
properly weighed the evidence and testimony to determine that P.B. was not
bullied by Ms. Green. Parents argue that the ALJ improperly weighed the
testimony of Ms. Green, Mr. Perkins, and Ms. Jones, arguing that they all
downplayed the events to protect themselves and the District from liability. The

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 20**

heart of the dispute seems to be that, while the Parents thought Ms. Green was bullying P.B., Ms. Green thought she was doing her best to control a student whose behavior was potentially putting him at risk of harm. The ALJ acknowledged that Ms. Green's attempts to control P.B. were obviously unsuccessful. Even if the Court were to disregard the ALJ's "bystander" theory, the record does not show that Ms. Green was purposefully bullying P.B., nor do Plaintiffs identify any of the ALJ's specific factual findings or legal conclusions that are inconsistent with the record. Furthermore, federal courts must give deference to ALJs where their opinions are based on credibility determinations of live witnesses. *Amanda J.*, 267 F.3d at 887-89. Plaintiffs offer no evidence to support their theory that District staff were lying in order to protect the District from liability, and the only witness testimony that they proffered to indicate bullying was from P.B.'s therapist and the director of the Gersh Academy, neither of whom ever witnessed any of the alleged bullying.

Even if Plaintiffs could establish that Ms. Green bullied P.B., they cannot show deliberate indifference by the District. Mr. Perkins responded promptly to Plaintiffs' concerns, reviewed available surveillance footage of the events, spoke to staff and parent witnesses, and concluded that bullying had not occurred. Although Plaintiffs might not have been satisfied with the outcome of Mr. Perkins' investigations, that is not enough to show deliberate indifference. Furthermore, as with the claims above, Parents withdrew P.B. before any steps could be taken to remedy their concerns and before any meeting between all concerned parties were held.

The Court sympathizes with Plaintiffs' position. Clearly, the relationship between Ms. Green and P.B. were far from perfect. However, Plaintiffs have not demonstrated that the ALJ erred. They show that they disagree with how the ALJ decided to weigh the credibility of witnesses, but the Court concludes that it is

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 21**

appropriate to defer to the ALJ's determinations. Accordingly, the Court denies Plaintiffs' motion and grants Defendant's motion.

5. <u>Whether the ALJ Erred in Not Granting Parents' Remedies of Placement at Gersh Academy and Reimbursement for Medical Services Despite Concluding P.B. was Denied a FAPE</u>

Finally, Plaintiffs argue the ALJ erred when, despite finding that P.B. had been deprived of a FAPE, she failed to grant them all of their sought remedies—including a prospective order of placement at the Gersh Academy at District expense and reimbursement for medical and therapeutic services. Plaintiffs argue the Court should overrule the ALJ and grant them a prospective order allowing P.B. to be enrolled in the Gersh Academy at the District's expense. They indicate that they only reason they had not already enrolled P.B. at the Academy is because they cannot afford the tuition and related expenses on their own. In response, the District argues the ALJ did not err and that Plaintiffs fail to cite to any part of the record or the law that indicates the ALJ abused her discretion in denying this relief.

"The IDEA provides for compensatory or 'retrospective' relief, as well as prospective relief, including 'a prospective injunction directing the school officials to develop and implement at public expense an IEP placing the child in a private school.'" *D.M. v. Seattle Sch. Dist.*, 170 F. Supp. 3d 1328, 1336 (W.D. Wash. 2016) (quoting *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985)). When a district court hears an appeal from a state hearing officer, it exercises broad discretion to craft relief under 20 U.S.C. § 1415(i)(2)(C). *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir. 2009). State hearing officers have similar discretion in crafting relief. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 243 n.11 (2009).

If a child is enrolled in private school while the IEP and appeals process is ongoing, parents are entitled to reimbursement for private school education only if a federal court concludes both that placement in a public school violated the IDEA

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 22**

and that the private school placement was proper under the Act. *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 15 (1993); *Ashland Sch. Dist.*, 587 F.3d at 1183; 20 U.S.C. § 1412(a)(10)(C)(ii). However, this does not require the parents to demonstrate that private placement furnishes "every special service necessary to maximize their child's potential"; instead, they "need only demonstrate that the placement provides educational instruction specially designed to meet the unique needs of a handicapped child, supported by such services as are necessary to permit the child to benefit from instruction." *C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011). Thus, a private school placement is proper so long as the proposed new school meets at least some of the student's additional needs. *Id.* at 1159. In addition, the IDEA provides that a student must be placed in the least restrictive environment which also meets the child's IEP goals, so as to provide disabled students with as much access to typically developing peers as is appropriate. *Cal. Special Educ. Hearing Office*, 93 F.3d at 1468.

The ALJ concluded that placement at Gersh Academy was inappropriate because Parents failed to show (1) that placement at the District would be a deprivation of a FAPE and (2) because placement at Gersh was not the least restrictive environment appropriate for P.B under § 1412(a)(5). The ALJ concluded that, because Parents removed P.B. from the District before evaluations could be completed and a new IEP developed, their actions prevented the District from developing a plan that would give P.B. a FAPE. She also noted that placement at Gersh would mean that P.B. would have almost no contact with typically developing peers, a drastic shift from his then-controlling IEP, which provided that P.B. be with his peers for nearly 98% of the school week. Finally, the ALJ noted that placement at Gersh would put a significant burden on P.B. because he would either have to spend a significant amount of each school day commuting

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 23**

from Thorp to Issaquah or would have to live in Issaquah without parts of his family for the school week.

Plaintiffs argue that this was an error because the ALJ found that violations of the IDEA as to the provision of language services to P.B. and prior written notices to the Parents deprived P.B. of an IEP. They also argue that two of their witnesses—Dr. Tutty and Dr. Sanchez-Nilsen—testified that P.B.'s autism has become so severe that return to the District would be detrimental and that he should be placed at a school like Gersh. They also testified that a school like Gersh could provide P.B. with the services he needed; however, both also testified that they were unaware of the services available at the District or at other school districts in the region. Finally, Plaintiffs argue that the District never had a plan in place to address P.B.'s needs, so they should not be required to "wait and see" what the District proposes. They argue that it makes no sense to argue that compensation is only available if parents who can fund private education can go ahead and enroll in a private school. The District argues that the ALJ should be upheld because Plaintiffs have failed to show that a placement at the District would result in a deprivation of a FAPE and fail to show that Gersh would be an appropriate placement.

The Court has considerable discretion in determining whether to grant the remedy of prospective placement at a private school. The ALJ also had considerable discretion in crafting her remedies. The Court notes several facts that impacted its decision: first, the District agreed to release P.B. for enrollment in an online homeschooling program through the Omak School District, but it never agreed private school placement would be appropriate. Second, P.B.'s parents never told the District until this case began that they were considering private school placement for P.B. and, after P.B. was withdrawn, they refused to engage with the District at all. Third, P.B. was withdrawn from the District before it could complete any evaluation or begin developing a new IEP to address P.B.'s new

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 24**

behavioral problems, so the fact that the District has no plan is partially Parents' fault. Based on these facts, the Court concludes Plaintiffs have failed to meet their burden to show that the ALJ's conclusions should be rejected. The Court agrees that it is unfortunate that it seems that, had Plaintiffs gone ahead and enrolled P.B. on their own and funded the tuition themselves, there might be more leeway to grant them some form of compensation. But they did not do that, and there is no reason in the record or legal or factual flaw in the ALJ's order to warrant granting this prospective relief. The Court therefore denies Plaintiffs' motion for placement at Gersh Academy and grants Defendant's motion.

The ALJ also denied compensation for private services, including therapists for P.B. Plaintiffs' Motion briefly mentions a request for reimbursement for Dr. Tutty's neuropsychological evaluation, and argues that they should be compensated for Dr. Tutty's services.[1] They further argue that the Court should order the District to use that evaluation and its recommendation for a more restrictive placement at Gersh Academy and to develop P.B.'s IEP, in connection with Issue #2 above. However, there is no law cited that would allow the Court to do this, as the duty to evaluate disabled students is placed on school districts, not private therapists hired by parents. Furthermore, Plaintiffs make no argument in their motion about why or how the ALJ's order on this point was improper under the law. The Court therefore denies Plaintiffs' motion and grants Defendant's motion.

Accordingly, **IT IS HEREBY ORDERED:**

1. Plaintiffs' Motion for Summary Judgment, ECF No. 36, is **DENIED**.

---

[1] The District argues the Court should consider this argument waived because, in its view, it was only presented for the first time in reply. However, the Court notes that it was raised in Plaintiffs' motion, although not in the same order that the District or this Court has considered the arguments. The argument is therefore not waived.

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 25**

2. Defendant's Opposition and Cross-Motion for Summary Judgment, ECF No. 37, is **GRANTED**.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order and provide copies to counsel.

**DATED** this 29th day of March 2021.



Stanley A. Bastian
Chief United States District Judge

**ORDER RE: CROSS-MOTIONS FOR SUMMARY JUDGMENT * 26**